IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENNETH TRINKAUS, | |
| Plaintiff, | Civil Action No. 12-5325 (PGS) |
| v. | OPINION |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

This matter is before the Court on the appeal of Plaintiff, Kenneth Trinkaus from the decision of the Commissioner of Social Security denying him a period of disability insurance benefits. The issue is whether substantial evidence supports the Commissioner's decision that Plaintiff was not disabled from his alleged onset date of disability (August 24, 2006) through the date of the Administrative Law Judge's decision (September 13, 2010).

I.

Plaintiff appeared and testified on his own behalf at a hearing before the Hon. Brian H. Ferrie on August 12, 2010. At the time of the hearing, Kenneth Trinkaus was a 51 year old man, which classified him as an individual closely approaching advanced age. Plaintiff is college educated and has a Bachelor's Degree in Civil Engineering. His primary occupation was performing computer drafting assignments for a consulting firm. As part of his job, he sat for long periods of time developing drawings on a computer, and as needed, he would lift and load 20 pound rolls of paper into the printer. He would also bend over frequently to collate sets of drawings.

Since the eighties, Plaintiff has suffered from severe degenerative disease of the back, congenital lumbar stenosis, depression, anxiety and a personality disorder. In addition, he has been diagnosed with syringomylia (syrinx) at T5 through T8 of the thoracic spine.

On May 31, 2006, Plaintiff was involved in a car accident in which his car was rear ended. Some of his prior back injuries were exacerbated as a result of that accident.

In July 2006, Plaintiff was terminated from his job. Plaintiff initially received unemployment benefits before applying for disability benefits in 2008, and he continued to receive unemployment benefits through March 2010.  During this two year period, Plaintiff testified that he had a variety of other health issues that prevented him from working, including arthroscopic right shoulder surgery, shooting pains in his legs, frequent urination (approximately 30 times a day), a burning sensation on the bottom of his feet, a burning sensation in his forehead, constant pressure in his head, intermittent dizziness and headaches.

On February 7, 2009, Plaintiff completed an Adult Function Report in conjunction with his application for Social Security Disability Benefits.  In that report, Plaintiff noted that his daily activities include (a) reading paperwork, news and emails, (b) driving short distances to the doctor or to the grocery store, (c) walking around the neighborhood, (d) exercising and stretching, (e) watching television, (f) sleeping, and (g) shopping at the grocery store or pharmacy. He pays bills and handles a checking and savings account. He does not socialize in hot weather because the weather causes unpredictable sudden bowel and urinary movements. He walks up to half a mile before having pain in his back and feet.  His attention span is about a half hour. He can follow verbal instructions, but headaches and poor concentration require rechecking instructions.  Plaintiff reports being able to handle stress and to function in a cooperative manner with authority figures. Due to pain in his back he dresses slowly. Leaning over the sink or

bending over to tie his shoes causes back pain. Plaintiff reports that he prepares three meals per day, does light yard work 4 times a year, washes one load of laundry per week, and vacuums, sweeps and mops occasionally. (R. 294).

Medical Treatment and Reports

Plaintiff's administrative record contains treatment notes and reports from various treating and non-treating physicians and professionals.  A summary is presented below in chronological order, and any test results are shown in single-spaced format.

Plaintiff first presented to Shore Urology, for evaluation of urinary frequency on June 3, 1986. At that time, Jules M. Geltzeiler, M.D. conducted urodynamic studies where simultaneous recording of urethral sphincter electromyography and detrusor contraction was monitored.  Dr. Gultzeiler noted that sensation to cold was not perceived. (R 546).

In 1987, Plaintiff was examined by Dr. Bunch, a rheumatologist at the Mayo Clinic in order to determine if Plaintiff suffered from Reiter's Syndrome which is now referred to as reactive arthritis).  Dr. Bunch opined that Plaintiff's symptoms "seemed to be related to anxiety," and concluded that the amount of Plaintiff's symptomology was out of proportion with what was found on the physical examination.

November 29, 2006. An abdominal ultrasound was no normal with no evidence of cholelithiasis, biliary ductal dilatation or cholecystitis; but two cysts in right kidney were found. (R. 420)

December 11, 2006. A surgical pathology report revealed no evidence of chronic or active colitis of the bowel tissue; grade 2 esophagitis in the gastroesophageal junction; small hiatal hernia; and diaphragmatic hernia without obstruction or gangrene. (R. 412)

October  2007. An MRI of the brain was unremarkable. (R. 478)

On February 12, 2008, Plaintiff was treated by Monte Pellmar, MD of the Headache and Neurological Care Center of New Jersey. On examination, Plaintiff complained of having a

3

sunburn feeling on his forehead. Dr. Pellmar's impression was dysesthesias of the forehead, but he could not provide a neurological explanation. He was seen again on September 4, 2008, at which time the neurological examination was unremarkable. Dr. Pellmar recommended a neurosurgical evaluation with regard to a possible syrinx. (R. 517).

Between February 20, 2008 and March 5, 2008, Plaintiff presented to Marcia Rachlin, a licensed clinical social worker ("LCSW") for psychiatric treatment three times. Ms. Rachlin noted that Plaintiff's credibility was questionable because he failed to follow up for ongoing treatment. Her report indicated that the Plaintiff had a depressed mood, somewhat flat effect, impaired judgment and that he complained of problems with concentration. (R 435). Ms. Rachlin noted that Plaintiff's social interaction was limited, noting social isolation, that Plaintiff was highly critical of others, and that he had problems getting along with others. Plaintiff's prognosis was noted as guarded. There were no limitations in his understanding, memory, concentration and persistence, but he had limited social interaction. He was unable to adapt to changes in a work setting. Ms. Rachlin noted Plaintiff never engaged in ongoing treatment. (R. 434-438).

On April 22, 2008, Plaintiff presented to a podiatrist, James P. Sullivan, DPM, with complaints of burning in both plantar feet, which had reportedly been getting worse over the past few years. Dr. Sullivan noted an existing diagnosis of ankylosing spondylitis. On examination, Dr. Sullivan assessed the Plaintiff with paresthesia bilaterally in the lower extremities; possibly secondary to radiculopathy related to ankylosing spondylitis. There does not appear to have been any treatment. (R. 556).

On May 13, 2008, Plaintiff was seen by Haralambos Demetriades, MD with complaints of low back pain exacerbated by twisting, and pain in his calves and feet. On examination, Plaintiff's motor strength was 5/5, deep tendon reflexes were symmetric and normal, and

4

sensation was intact. Dr. Demetriades' impression was displaced lumbar intervertebral disc without myelopathy, lumbar strain, and degenerative disc disease of the spine. He prescribed home exercise and physical therapy. He also recommended an epidural injection. (R. 451).

May 16, 2008 MRI of the lumbar spine. The impression was mild degenerative changes through the lumbar spine superimposed on a congenitally narrowed canal, as well as shallow disc herniation at the L5-S1 level with no clear evidence of nerve root impingement. (R. 455, R. 484).

On May 22, 2008, Plaintiff presented to rheumatologist Deborah Alpert, MD, PhD, at Meridian Health with similar complaints. Dr. Alpert noted Plaintiff was diagnosed with seronegative spondyloarthropathy in 1988. On examination, Dr. Alpert observed thoracolumbar spine tenderness to palpitation. Plaintiff's back pain was exacerbated with flexion and extension. The doctor further noted bilateral glenohumeral joint tenderness to palpation and mild subacromial tenderness to palpation. Dr. Alpert suspected that most of Plaintiff's low back pain is caused by congenital lumbar spinal stenosis, in addition to superimposed mild degenerative disc disease. Dr. Alpert initiated a trial of Celebrex (or Aleve as an alternative) and a plan of pain management including a steroid injection for the lumbar stenosis and Plaintiff's superimposed mild degenerative changes. (R. 443-446). It is unknown whether such treatment was undertaken.

June 24, 2008 ACT scan of the abdomen and pelvis showed no evidence of a mass, obstruction or abnormal calcifications in the abdomen, pelvis, kidneys, ureters or urinary bladder. A small renal cyst was noted in both kidneys.

August 8, 2008 MRI/CT scan of the cervical spine showed mild hypertrophy at the C4-5 level resulting in mild bilateral neural foraminal stenosis, and a moderate sized disc osteophyte complex at the C6-C7 level resulting in moderate bilateral neural foraminal stenosis (R. 477).

In September 2008, Plaintiff was treated by Dr. Bruce Rosenblum, a neurologist. Dr. Rosenblum noted Plaintiff's syrinx at T5 through T8 and opined that it may be post-traumatic in nature. Dr. Rosenblum ordered an MRI of the thoracic spine for completeness.

September 11, 2008  MRI/CT scan thoracic spine with contrast showed small disc protrusions at the T6-7, T7-8, T9-10, and T10-11 without evidence of cord flattening and from T5 to T8 a non-expansile syrinx.  (R. 282, 285).

On October 10, 2008, Plaintiff underwent a consultative psychological examination by Jack Baharlias, Ed.D. (R. 497). According to Dr. Baharlias, at the initial interview, there was no indication that Plaintiff was psychotic or had a thought disorder. His thinking was logical. He had good eye contact and was well oriented, but was obsessed about his illnesses. Despite same, his emotional range was adequate, and his behavior was appropriate. He was neither intense, nor vegetative. He acknowledged some sleeping problems, and was upset that his injuries prevented him from country western dancing.  Dr. Baharlias diagnosed Plaintiff with depressive disorder associated with a general medical condition, pain disorder associated with physical and psychological factors, anxiety disorder, and a personality disorder with some schizoid characteristics. (R 499).

On November 10, 2008, a Psychiatric Review Technique (review of the record by non-treating physician) by Ina Weitzman was conducted. Dr. Weitzman's impression was non-severe affective disorder and non-severe personality disorder. According to Dr. Weitzman, the record did not show any psychiatric treatment, other than the consultative examination, and three visits with a mental health professional (Ms. Rachlin). Dr. Weitzman found that Plaintiff had a medically determinable mental impairment that did not rise to the level necessary to satisfy the diagnostic criteria for affective disorder (listing 12.04); but rather was deemed to be depression secondary to pain disorder. Similarly, it was found that Plaintiff's personality disorder with

schizoid characteristics did not satisfy the diagnostic criteria of a personality disorder (listing 12.08). (R. 507)  The psychiatric review found that Plaintiff's restrictions of activities of daily living were not limited; his difficulties in maintaining social function and maintaining concentration, persistence and pace were mild; and that he had not experienced any episodes of decompensation. (R. 510).

On January 29, 2009, Plaintiff was treated by Tariq S. Siddiqi, MD, a neurologist, on one occasion. Mr. Trinkaus restated his medical issues and emphasized that his back pain and urinary frequency started in 1986. Dr. Siddiqi reviewed the MRIs of the thoracic spine and lumbar spine that had shown a non-expensile T5 to T8 syrinx and degenerative disc disease with sub-articular disc protrusion at the L5-S1 level that does not affect the descending left S1 nerve root; and showed cervical spondylosis at the C4-C5 and C6-C7 levels.  After Dr. Siddiqi examined Plaintiff, he found (a) the cranial nerve examination was within normal limits; (b) there was no limitation of movement in the cervical spine; (c) only mild tenderness in the thoracic region; (d) straight leg raising maneuvers were negative; (e) reflexes were symmetrical; and (f) the sensory examination was unremarkable. Dr. Siddiqi's impressions were cervical spondylosis at the C4-C5 and C6-C7 level, and a non-expansile syrinx from T5 through T8 with small disc protrusions at the thoracic area. Dr. Siddiqi stated that Mr. Trinkaus' symptomatology was out of proportion to the findings.

On February 9, 2009, Plaintiff saw Michael G. Nosko, M.D., PhD, for a surgical consult. Dr. Nosko noted Plaintiff's history of back pain with radiation down to the sole of the feet, stiffness in the neck, burning sensation on the forehead and constant, frequent urination of small amounts.  He also noted that the Plaintiff was "very anxious."  Dr. Nosko reviewed the MRI's of

Plaintiff's thoracic and lumbar spine. He noted that there was nothing surgical that could be done, and referred Plaintiff for a urologic evaluation. (R. 542).

On February 18, 2009, Plaintiff presented to the New Jersey Urologic Institute, and was seen by Ilan Waldman, MD. A urodynamic study was conducted and revealed decreased bladder compliance. (R 560).

On July 17, 2009, Plaintiff presented to Don M. Long, MD, PhD at Johns Hopkins in Baltimore. Dr. Long reviewed the diagnostic studies and concurred with prior radiology reports finding degenerative disc disease of the lumbar spine, syrinx T5-T8 without associated chord signal changes; hemangioma and forminal stenosis. Dr. Long also noted a decrease in the range of motion of Plaintiff's neck and observed the lumbar musculature to be tight bilaterally. Dr. Long assessed a probable upper cervical facet injury leading to headaches, and he opined that Plaintiff's headaches could be from a cervical spine change at C6-C7. He recommended root blocks and facet blocks at C2-C4, but noted that these would only address Plaintiff's upper extremity symptoms. (R. 563)

Dr. Long also assessed a syrinx at T5-T8, commenting that it was small, and that it could not be treated directly. Dr. Long suggested that the syrinx may be the cause of local pain and urinary frequency; and that a study be repeated in one to two years to assess any growth of the syrinx. Dr. Long further commented that this would be a diagnosis of exclusion unless cystometrogram studies demonstrate a clear-cut neurogenic bladder. Finally, Dr. Long found that the lumbar studies showed significant disc disease and recommended facet blocks at various areas of Plaintiff's lumbar spine.

On July 28, 2009, Plaintiff was seen by Peter Staats, MD of Premier Pain Centers. Dr. Staats recommended nerve root blocks at C2-C3 segment, C2 and C3 nerve root blocks

bilaterally, facet block at upper cervical spine, as recommended by Dr. Long. Dr. Staats also noted that the syrinx may cause urinary dysfunction and discussed medication options with Plaintiff. (R. 568-569).

At a follow up visit to Dr. Long on December 1, 2009, Dr. Long noted that the root blocks at C2-C4 didn't work, and in fact, made Plaintiff's neck dramatically stiff and the burning worse. He recommended another block at C6-C7 and advised against surgery at that time. He noted that the cause of the syringomyelia (syrinx) was unknown. Dr. Long noted that no action should be undertaken on the syrinx, but recommended a repeat MRI every two to three years to watch for changes. (R. 565).

June 8, 2010 MRI of the lumbar spine without contrast. The alignment was normal. There is a small right paracentral disc protrusion present at the L1-L2 level, resulting in moderate right neural foraminal narrowing and mild right paracentral spinal narrowing. Slight broad based disc bulge is seen at the L3-L4 level with mild bilateral neural foraminal stenosis and mild central spinal stenosis along with hypertrophy of the ligament flavum. There is mild broad based disc bulge present at L4-5 level along with hypertrophy of the ligamentum flavum and facet joints, resulting in mild central spinal stenosis and mild bilateral neural foraminal stenosis. Slight broad based disc bulge is seen at L5-S1 without neural foraminal stenosis or spinal stenosis. A 3.8 cm cyst was seen in the midpole of the right kidney with additional smaller T2-hyperintense lesion measuring 8 mm on image #2. These likely represent simple cysts; however, these are incompletely characterized given lack of IV contrast. There is a suggestion of additional cyst in the left kidney, somewhat difficult to evaluate. (R. 576).

June 10, 2010 MRI of cervical spine without contrast (with comparison made to the MRI of August 8, 2008. The impressions were of stable disc osteophyte complex at C6-7 level, resulting in mild central spinal stenosis and moderate bilateral neural foraminal stenosis. Stable mild bilateral neural foraminal narrowing at C4-5 level secondary to uncovertebral joint enlargement. (R. 575)

June 16, 2010 MRI of thoracic spine with and without contrast (with comparison made to MRI of August 6, 2008). The findings were that the syrinx extending on the spinal cord extending from T5 to T8 had not significant changed in size or appearance from the prior MRI. At T10-11 there is left foraminal disc herniation, which results in left neural foraminal narrowing with probable impingement of the left T10 nerve root. These findings have worsened since the prior MRI. Small central disc herniation's are seen at T5-6 and T6-7 which were stable. A small central to left paracentral disc herniation is seen at T8-0, which is slightly more prominent when compared with prior study without evidence of significant central canal or neural foraminal

9

narrowing. Hemangioma was seen in the T7 vertebral body. Multilevel degenerative changes are seen with Schmorl's nodes. (R. 574).

On June 21, 2010, Plaintiff was treated by Jonathan Lustgarten, MD of Neurological Associates of New Jersey. Dr. Lustgarten recommended a full evaluation at a major tertiary facility where spinal angiography would be available on a multi-disciplinary basis. (R. 570-571).

Residual Functional Capacity Assessment

The Physical Residual Functional Capacity Assessment dated October 10, 2008 found that Plaintiff's limitations were as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks for a total of about 6 hours per 8 hour work day; sit (with normal breaks) for a total of 6 hours per 8 hour work day; and unlimited pushing and/or pulling (including operation of hand and/or foot controls). Postural limitations were that Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl, but never balance. There were no manipulative, visual, communicative or environmental limitations found. (R. 489-493).

II.

A claimant is considered disabled under the Social Security Act (the "Act") if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2)(A); *see Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin*., 220 F.3d 112, 118 (3d Cir. 2000);

*Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. § 405(b). The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions. *See Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262. The Social Security Administration has developed a five-step sequential process for evaluating the legitimacy of a plaintiff's disability. 20 C.F.R. § 404.1520. First, the plaintiff must establish that he is not currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If the plaintiff is engaged in substantial gainful activity, the claim for disability benefits will be denied. *See Plummer*, 186 F.3d at 428 (*citing Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)). In step two, he must establish that he suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If plaintiff fails to demonstrate a severe impairment, disability must be denied.

If the plaintiff suffers a severe impairment, step three requires the ALJ to determine, based on the medical evidence, whether the impairment matches or is equivalent to a listed impairment found in "Listing of Impairments" located in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.*; *Burnett*, 220 F.3d at 118-20. If it does, the plaintiff is automatically disabled. 20 C.F.R. §404.1520(d). But, the plaintiff will not be found disabled simply because he is unable to perform his previous work. In determining whether the plaintiff's impairments meet or equal any of the listed impairments, an ALJ must identify relevant listed impairments, discuss the evidence, and explain his reasoning. *Burnett*, 220 F.3d at 119-20. If the plaintiff does not suffer from a listed severe impairment or an equivalent, the ALJ proceeds to steps four and five. *Plummer*, 186 F.3d at 428. In step four, the ALJ must consider whether the plaintiff "retains the residual functional capacity to perform [his or] her past relevant work." *Id*.; *see also Sykes*, 228 F.3d at

11

263; 20 C.F.R. § 404.1520(d). This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the plaintiff's residual functional capacity (RFC); 2) make findings with regard to the physical and mental demands of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based on that comparison, determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120. If the plaintiff cannot perform the past work, the analysis proceeds to step five. In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the plaintiff can perform. *See* 20 C.F.R. § 404.1520(g). If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits. *See Yuckert*, 482 U.S. at 146 n.5; *Burnett*, 220 F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986). In demonstrating there is existing employment in the national economy that the Plaintiff can perform, the ALJ can utilize the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, which consider age, physical ability, education, and work experience. 20 C.F.R. § 404, subpt. P, app. 2. However, when determining the availability of jobs for Plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone," because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*, 228 F.3d at 269-70. Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the Plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id.* at 270-71, 273-74; *see also Burnett,* 220 F.3d at 126 ("A step five analysis can be quite fact specific, involving more than simply applying the Grids, including... testimony of a vocational

expert.") If this evidence establishes that there is work that the Plaintiff can perform, then he is not disabled. 20 C.F.R. § 404.1520(g). Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. 42 U.S.C. § 405(g). *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). *Doak*, 790 F.2d 26 at 28. Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft,* 181 F.3d at 360 (*quoting Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9. The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.*Morales*, 225 F.3d at 316 (*citing Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *see also Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating district court is not "empowered to weigh the

evidence or substitute its conclusions for those of the factfinder"). A reviewing court will not set aside a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. *See* 20 CFR § 404.1529. Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain. A claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless 'medical signs' or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. §404.1529(b); *Hartranft*, 181 F.3d at 362. In *Hartranft*, claimant's argument that the ALJ failed to consider his subjective findings was rejected where the ALJ made findings that claimant's claims of pain and other subjective symptoms were not consistent with the objective medical records found in the record or the claimant's own hearing testimony.

### III.

On September 13, 2010, the ALJ found that Plaintiff had severe degenerative disease of the back and congenital lumbar stenosis, and that Plaintiff suffers from depression, anxiety and a personality disorder. Despite same, the ALJ found that these impairments did not impose any limitations on Plaintiff's ability to perform basic work related activities, and that Plaintiff was

capable of performing his past relevant work in computer drafting.  (20 C.F.R. § 404.1536, 20 C.F.R. § 404.1565).

Plaintiff argues that the ALJ "selectively discussed the medical evidence with respect to Plaintiff's mental impairments, Plaintiff's back and neck impairments, including his syrinx, cervical spondylosis, seronegative spondyloarthropathy, and urinary frequency" without looking at the overall condition of Plaintiff.  With regard to mental impairments, in order to be found severe, the claimant's impairment(s) must "significantly limit [his] ability to perform basic work-related activities."  Social Security Ruling (SSR) 85-28. The Commissioner's regulations and rulings define the basic work-related mental activities to include: understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. See 20 C.F.R. § 404.1521(b).  Plaintiff's own statements to Dr. Baharlias at the October 16, 2008 consultative examination found otherwise.  Plaintiff stated that he spent his days using a computer, reading the newspaper, looking for work, emailing his friends, and researching his medical problems (R.  498). Therefore, the ALJ found that these self-reported abilities demonstrate that Plaintiff had no limitations in performing basic mental work activities. See 20 C.F.R. § 404.1521(b); SSR 85-28.

Plaintiff also argues that the ALJ erred by relying on the findings of Marcia Rachlin, LCSW[1] that Plaintiff should return to work, but failed to consider Plaintiff's symptoms including a depressed mood, impaired judgment and problems with concentration.  Plaintiff furthered that Ms. Rachlin's impressions and findings should be considered in conjunction with the findings of Dr. Baharlias.  Dr. Baharlias found that Plaintiff was not psychotic and did not have a thought

---

[1]     Ms. Rachin is a licensed clinical social worker and is not an expert in psychology.

15

disorder.  He further found that Plaintiff's thinking was logical, that he had good eye contact and was well orientated, but he was verbally driven about his illnesses.  Dr. Baharlias found that Plaintiff's emotional range was adequate, his behavior appropriate, and he was not delusional.  No other phobias were noted, and his insight and judgment were satisfactory.  Dr. Baharlias provided an Axis I diagnosis of depressive disorder associated with a general medical condition, pain disorder associated with physical and psychological factors, anxiety disorder not otherwise specified and personality disorder not otherwise specified with some schizoid characteristics. (R 499). Plaintiff treated with Ms. Rachlin on only three occasions, and although Plaintiff's prognosis was noted as "guarded," she noted that Plaintiff never engaged in treatment, and he did not follow through on any suggestions or return for treatment. (R. 438). Therefore, even if the reports of Ms. Rachlin and Dr. Baharlias are considered together, there is no evidence that the ALJ "ignored or implicitly rejected" any mental impairment of Plaintiff.  Rather, the Plaintiff simply never undertook any treatment for his alleged mental disorder.

Plaintiff also argues that Dr. Bunch of the Mayo Clinic recommended psychiatric therapy in 1987, but that the ALJ did not consider Dr. Bunch's recommendation. Plaintiff is correct that the ALJ did not mention Dr. Bunch's review; however, Dr. Bunch is a rheumatologist who examined Plaintiff to determine if Mr. Trinkaus suffered from Reiter's Syndrome (reactive arthritis).  It was Dr. Bunch's opinion that Plaintiff's symptoms "seemed to be related to anxiety."  As such, in 1987, Dr. Bunch concluded:

> If he cannot handle things in the future he should consider a psychiatrist rather than a rheumatologist. Although I cannot tell him whether he ever had Reiter's I certainly don't think he has it now and even if he did, the amount of symptomology he has is out of proportion with what we find on a physical examination.

One cannot conclude from Dr. Bunch's comment that he had diagnosed any mental disorder, and it would be speculative and remote to combine a comment from twenty years ago with Plaintiff's current issues.

      The ALJ's conclusion that Plaintiff's mental impairments were non-severe under the regulations is also supported by the November 10, 2008 Psychiatric Review Technique by Dr. Weitzman wherein Plaintiff was found to have a medically determinable mental impairment, but that it did not precisely satisfy the diagnostic criteria for affective disorder (20 C.F.R. § 404, Subpart P, Appendix 1, listing 12.04); but rather was deemed to be depression secondary to pain disorder. Similarly, it was found that Plaintiff's personality disorder with schizoid characteristics did not satisfy the diagnostic criteria for finding a personality disorder (20 C.F.R. § 404, Subpart P, Appendix 1, listing 12.08). (R. 507).  The psychiatric review further found that Plaintiff's restrictions on activities of daily living did not limit his ability to work; and his difficulties in maintaining social function, concentration, persistence and pace were mild. (R. 510).  Based on the foregoing, the ALJ reasonably concluded that Plaintiff's mental impairments caused no more than minimal limitations in his abilities to understand, carry out, and remember simple instructions; use judgment; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting .

      With regard to Plaintiff's urinary frequency, Plaintiff argues that the ALJ overlooked evidence in the record that directly relates to this symptomology. That is, paraphrasing from Plaintiff's brief; he notes: 1) Dr. Long, opined that the Plaintiff's urinary frequency could be caused by his syrinx; 2) Peter M. Staats, M.D. also opined that the Plaintiff's syrinx could be the cause of some of the Plaintiff's urinary dysfunction; and 3) a urodynamic study conducted on February 18, 2009 showed decreased bladder compliance.  Plaintiff's counsel avers

Plaintiff's urinary frequency and syrinx provide objective support for the existence and potential pathology of the Plaintiff's urinary dysfunction. In that regard, the ALJ does acknowledge Plaintiff's syrinx in several areas of the opinion, but relies on the reports of various doctors that seem to indicate that Plaintiff's syrinx is not disabling[2]. For example, the ALJ cites to the July 13, 2009 report of Dr. Long where it was found that Plaintiff had a clear-cut syrinx at the T5 through T8 levels for which he referred him to a neurologist rather than suggesting surgery. Plaintiff followed up with Peter Staats, M.D. two weeks later, and it was Dr. Staat's opinion that the syrinx could cause some urinary dysfunction, but only recommended medication (Lyrica).

In conclusion, the ALJ relied substantially on the above opinions of Plaintiff's treating physicians to find that Plaintiff's urinary frequency did not result in disability. Interestingly, Plaintiff presented the same symptoms to Dr. Bunch in 1987, and he continued to work for the next twenty years with the urinary frequency issues.

With regard to Plaintiff's back and neck impairments and other spinal pathology, Plaintiff argues that they are far more extensive than the ALJ's step two finding, wherein the ALJ found that Plaintiff had a severe impairment of degenerative disease of the back, and congenital lumbar stenosis, but failed to find any cervical spondylosis or seronegative

---

[2] The criteria for establishing disability due to Syringomyelia appears at Listing 11.19 of the "Listing of Impairments" located in 20 C.F.R. § 404, Subpart P, Appendix 1. No party argued that the listing applied. According to listing 11.19, a claimant is found to be disabled if the syringomyelia is accompanied by a) significant bulbar signs; or b) if there is disorganization of motor function as described in listing 11.04(B). Paragraph B of Listing 11.04 (central nervous system vascular accident) reads: significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C). Although neither party argues same, there is no evidence in the record of Plaintiff's impairments rising to the level to meet the criteria for disability due to syringomyelia.

spondyloarthropathy. To the contrary, the ALJ relied on the May 22, 2008 report of Deborah Alpert, M.D., Ph.D. wherein she concluded "although there may be a historical inflammatory component of his low back pain, on examination and imaging, there was no evidence of ankylosing spondylitis or other spondyloarthopathy and if there was indeed a component of seronegative spondyloarthropathy, it was mild." This conclusion is in line with the results of the diagnostic testing.

Lastly, Plaintiff argues that the ALJ erred in his credibility determination wherein the ALJ found that Plaintiff's alleged limitations appeared exaggerated compared to the objective medical evidence of record. As noted above, Plaintiff's responses to the Adult Function Report at the onset of his case indicate that his daily activities included reading paperwork, news and emails, driving to the doctor or to the store to shop, walking around neighborhood, and exercising and stretching. (R. 287). He prepares three meals per day, does light yard work four times a year; and one load of laundry per week and some vacuuming, sweeping and moping despite his back pain. He can walk, drive and ride in a car. In addition he can pay bills and manage a checking and saving account. He can pay attention for about an hour; he can following instructions; and he gets along well with authority figures. He is able to handle stress, albeit it, not as well as he used to. (R. 294). The ALJ has discretion to evaluate the credibility of Plaintiff's complaints and draw a conclusion based upon medical findings and other available information. *Jenkins v. Commissioner*, 2006 U.S. App. Lexis 21295 (3d Cir. 2006). And, inasmuch as the ALJ had the opportunity to observe the demeanor and determine the credibility of Plaintiff, the ALJ's observations on these matters must be given great weight. *See Wier v. Heckler*, 734 F. 2d 955, 962 (3d Cir. 1984).

Conclusion

The court's sole inquiry is whether the record, read as a whole, yields such evidence as would allow a reasonable person to accept the conclusions reached by the Commissioner. Even where evidence is susceptible of more than one rational interpretation, it is the Commissioner's conclusions which must be upheld. *Sample v. Schweiker*, 694 F. 2d 639, 642. The court also reviews the record and the ALJ's decision to make certain that the ALJ did not ignore or fail to resolve a conflict created by countervailing evidence. *Daring v. Heckler*, 727 F. 2d 64, 70 (3d Cir. 1984). Plaintiff asserts that the ALJ selectively reviewed the evidence. To the contrary, the ALJ's opinion made reference to the opinions of more than a dozen doctors, none of whom opined that Plaintiff was disabled. One report which was not mentioned by the ALJ was the report of Dr. Bunch, a rheumatologist, who examined Plaintiff in 1987. Dr. Bunch's opinion is of little help to Plaintiff's case because he opined that "the amount of symptomology is out of proportion with what we find on physical examination."

Moreover, the ALJ analyzed many of the diagnostic reports and more than adequately explained his rationale for his findings. When looking at the record as a whole, there is no evidence of any selective finding of fact or conclusions of law. The ALJ's decision is based on substantial evidence. 42 U.S.C. § 405(g). *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Sykes v. Apfel*, 228 F. 3d 259. 266 n. 9 (3d Cir. 2000). The decision of the Commissioner is affirmed, and the complaint is dismissed.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.